Good morning, Ms. Fennelly-Greer. Yes, good morning, Your Honor. May it please the Court, my name is Lisa Jo Fennelly-Greer, and I represent Stephen Corey James, the appellant in this case. I would also ask to reserve three minutes for rebuttal. Very good. Your colleague will be arguing, I assume, the amendment issue, is that right? That is correct, Your Honor. Your Honor, I would also like to touch on the amendment issue as well, because I've been counsel in this case since 2006. I probably know more about this case than probably anyone else. Were you representing the plaintiff in this matter at the time of the amendment? Yes. Yes, sir, I was. Okay. All right. And I'll be happy to answer any questions in regard to the amendment or the filing of the amendment, anything. I was counsel at that point. I do want to point out that Mr. James, the appellant in this case, filed his initial complaint with the race discrimination claim. He filed that pro se. And then I became his counsel, and I requested an amendment to the Pennsylvania Human Relations Commission, and that occurred on September of 2006, and that is in the record. Counselor, some of the evidence here has to do with whether Mr. Sulzer or Mr. James really was the one who should have gotten the position. I mean, the district court said, okay, they can only have one, and they like Sulzer. But I'm concerned about whether, you know, which one should have been chosen. Your client testified that he had excellent performance reviews. Yes. And yet I don't see those in the record. Were they made part of the record at any point in time? Yes, that's in. I do not know. We do not have the actual performance reviews. No. Did you subpoena them or get them from the company? I did. They do not have them. We do not have them. You're saying they did not have them. They didn't have them. Ms. Fanelli-Greer. I mean, I don't have the actual complete federal court record here today. I have our own. I want to speak into the mic, please. Ms. Fanelli-Greer. Yes. Didn't Mr. James expressly deny during his deposition that he was disciplined because of race or disability? Page 34 of the deposition transcript. It's in the appendix 105A. Question, so you're not contending that it was unfair because of your race or disability? Answer, no. This is within the context of asking him about his dismissal after he returned from the period of time he was off. What should we make of that? Well, I would also point you to that he, in his deposition transcript, and that's found at Exhibit A of the federal court record, the district court record, Exhibit A at 41, pages 8 through 12, where he does say that Mr. Salm discharged him due to race and disability. Wait a minute, but the 104 reference, that has to do with when he was out on paternity leave, and he wasn't present when it wasn't in good condition, and he was written up. Isn't that a disciplined situation? That's not when he was let go, was it? The situation, that was back in 2004, and in fact he also discusses in his deposition that he felt that he was improperly disciplined and that the two Caucasian employees who were there were not disciplined, and he was out on paternity leave. His son had just been born, and the two Caucasian employees who were actually there and actually caused the problem were not disciplined at all. And we did raise that, and we raised that not only in our brief to the district court, but we also pointed it out here in this court as well. What do you mean by the employees who caused the problem? Where does that appear in the record? That's not something I recall from what's in the appendix. Mr. James was out for, I believe, approximately a week or maybe a week and a half. I can't remember exactly how long he was out, but he was out in 2004 for the birth of his son, and evidently the prep shop got, you know, there was trash built up or these gentlemen didn't take out the trash or something like that. Anyway, he was written up, but these two Caucasian employees were not written up, and we did point that out. We felt that that was the beginning, and even in Mr. James' deposition, he mentioned that he felt that that was the beginning of his being treated differently. And I also want to point out that Mr. James was the only African-American employee at the Carlisle Pike facility, which was where he originally worked, and then he was the one of three African-American employees when he was transferred to the Harrisburg facility. Counsel, the employer also testified. I can't remember whether it was Mr. Somm or whether it was Mr. Sutliff, testified that the condition of the shop was such that it couldn't have happened in the short period of time he was off, and I don't recall seeing anything in the record that refutes that. Is there? Well, Mr. James, at his deposition, stated that he didn't feel that, you know, it wasn't his fault. He wasn't there at the time. He didn't cause the incident. He wasn't there, and that he felt that these two Caucasian employees, you know, they should have at least been written up. They should have had a warning. They should have had something done. They were the ones that actually did this, whereas he's the one that's getting written up. And then he ultimately gets transferred to the Harrisburg facility based upon that incident. Now, this is a gentleman who at the time of his discharge was working for six and a half years. Now, one of the things that we bring out in our brief to this court is that, you know, hey, this guy's a six and a half year employee. Why do you get rid of him when, you know, and then you keep somebody that's only been there a month as a car washer? Give us the instances that show racial discrimination. Okay. Okay. The first is, as I mentioned, the two Caucasians that didn't take the trash out. That's found in Exhibit A, which is James' deposition, and that's at 44-3-18. Again, James' deposition where he's off due to the birth of his son, 44 pages, citations 12 through page 45-8. The fact that the two employees working in the prep shot at the time of the inspection were Caucasian and they did not get any warnings or reprimands, only the plaintiff. Let's get to some of the others. We've gone through those. We also pointed out in our brief, I'm not sure if it was the reply brief, I think it was the reply brief, that Mr. Smith, David Smith, laughed when Mr. James was discharged and said, you're out of here. We also have the fact that John Somme, and I quote that testimony, I believe it's in my, yes, it's in the reply brief. Appellant stated in his deposition that Appellee's termination of him by John Somme was due to either race or disability, that's at 41-8-12, and then he felt that the first time that John Somme met him, there was animosity. The fact that there's a whole dialogue that occurs five days before, just five days before he is discharged on March 2nd of 2006. He has an interaction with John Somme while he is there visiting the dealership, and that's just five days, and I quote that. It seems to me a lot of that evidence would almost be an FMLA discrimination, that you're not here, they're doing the best they can. How can you come in here if you've been off and complain about what they're doing when they're here working and you're not? And yet there is no claim here for FMLA discrimination because he took leave, is there? No, no, ma'am, there isn't. Because some of it seems to point in that direction, you know, Solzer, well, he's here working, he's been here, you know, and you haven't, but I'm just not sure whether it points to racial discrimination. Well, I think it does, Your Honor, because John Somme was the decision maker. John Somme was hired in, I believe, November or December of 2005. Well, they clearly didn't get along, and he admits that. You know, James says, you know, he didn't like me. Right, and he, based upon that, he has this interaction with him on March 2nd of 2006. Now, keep in mind that Mr. James was on leave from November of 2005 to March of 2006. He comes back five, he just comes into the shop to talk or whatever. Remember, Mr. James has been doing this job as appearance technician for approximately six and a half years at that time. But not for the last six months. Correct. Yes, Your Honor, that's correct. And so he sees what he feels is wrong with someone else detailing the car. So he says, hey, you know, I don't think you did that right. And he feels that, listen, as lead technician or whatever he was supposed to be, he was supposed to be a lead technician, that he had the right to do that. Well, John Somme comes down on him because of it. Mr. James feels that, hey, you know what, I don't, that this guy doesn't like me. And he's the decision maker. Five days later, he is discharged. Suddenly, there's no work for him that's available for him. And he's a six and a half year employee. There's no work available. Salzer's only been there a month. Good. Let me see if my colleagues have any questions. I'll have you back on rebuttal. Thank you, Your Honor. Thank you very much. Good morning. May it please the court. My name is Elizabeth Theron and I represent the EEOC. The commission filed an amicus brief in this case, mainly to address the district court's handling of the plaintiff's attempt to amend his original charge to add a charge of disability discrimination. A series of procedural breakdowns at the PHRC led to Mr. James's charge never being amended. And this court recognized in Hicks that these kinds of circumstances present equitable grounds to waive the verification requirement. Does it make a difference that in Hicks there was an internal problem where the commission didn't follow its own rules, but the matter was improperly filed? Does that make any difference? Actually, Your Honor, I would say that Hicks and this case present exactly the same scenario in that regard. In both cases, there was an internal problem. And in both cases, the agency failed to follow its own statutory and regulatory obligations. In fact, this issue really has kind of been misframed since the beginning. The fact that this was framed as a failure to verify case is kind of odd, because really what it is is a failure to process case. In Hicks, what this court had, all that this court had before it, was the charging party's deposition testimony that he had attempted to add a claim of sex discrimination. I went to the EEOC. I think I said I wanted to, and the EEOC said I couldn't. So there's no documentary proof there. I mean, there's an appendix reference in our opinion, but I didn't go back and look at the record. So there's just the mere allegation that he tried, but it was refused or turned away. So we don't know what he did. Correct. In Hicks, this court held there was a genuine dispute of material fact on this point that was generated by the charging party's deposition testimony. Do we know what in the rules the requirement is for an amendment? Actually, we addressed this in our brief. Interestingly, both the EEOC regs and the Pennsylvania state regs do not speak to whether an amendment has to be independently verified. That's right, and that's why I'm intrigued by the position that the agency has taken in its amicus brief. Let me see if we can, I think we can agree on a few things here. Sure. We can agree then that the statute and the regs mandate that a charge be in writing and that it be verified. Yes. And so Judge Caldwell was correct in his iteration of that, reiteration of that principle. Yes. And the charge here was verified. Correct. By Mr. James. Correct. So what I intended to ask you and what you've already answered is I think neither the statute nor the regs say that an amendment has to be verified. That is exactly right. Now, but instead of taking that textual position, you really have argued to us that it ought to be the equities that we weigh. You've made an equitable argument on behalf of Mr. James, haven't you? Yes, Your Honor, we have. You haven't come out in your amicus and said, look, it's clear from the language of the statute and the language of the regs, you don't need a verified amendment. Generally, it is the practice of the state agencies and the EEOC, and again, I don't work in this division of the EEOC, so it is not my job to that it is their general practice that they try to have these things verified when possible. But that said, this court... You don't want us to take a textual position, do you? That might be to the disadvantage of the agency. Be careful what you ask for. It isn't. We're not here about the advantage to the agency. We're here... I think this court really delineated the equities of this scenario and the dynamics of this scenario beautifully in Hicks. This scenario really is no different from what happened in Hicks, fundamentally. It's been framed from the beginning... Well, let me get back, though, to the verification requirement. There would be a problem if someone filed a verified charge that said, I was discriminated against, bingo, that's it, and then filed an amendment, you know, a 14-page amendment with chapter and verse with no verification. I mean, we can't really say that because there is no verification requirement, any amendment can be filed without verification, because the amendment may contain the meat of the case. Or it may be an entirely different kind of charge, as it was here, disability instead of race. And here it was telling the employer, you know, we're saying that you did discriminate based on disability. Well, then the employer... The verification requirement would seem to follow with an amendment because the employer has to know that you really mean it, that you really, you know, you're going to pursue this and this is something that you're going to stand behind. So I think it would be problematic for us to say just wholesale, and by the way, it doesn't say so every amendment need not be verified. So I think then your argument on Hicks becomes, let's not just, let's not look at verification, let's look at what an investigation would uncover. In Hicks, like here, there was no interview at all of Mr. Hicks. He didn't even know until he got the not right to sue letter. Similarly here, wouldn't an investigation turn up the fact that, was it Smedley, that Smedley had all these documents, he had this letter, he had this investigator look at that, talk to Mr. James and say, you know, what about this? So wouldn't this fall squarely under Hicks to say this should be encompassed in any reasonable investigation or the district court should at least answer that question? I see that my time is up. I have so much to say. May I answer? I want to be clear about Hicks first of all. Hicks, there were actually two holdings on this point in Hicks, and this is something that the district court really missed. On page 964 of Hicks, the court says, there are at least two possible bases for jurisdiction which appear in the record and which cannot be rejected by summary judgment. And what I think, Judge Rendell, you may be referring to is the second holding of Hicks, which is whether within the scope of the investigation of the first charge, which in this case would be race, they would have uncovered the disability allegation. Actually, what we're relying on and what we believe really is on all fours here is the first holding of Hicks. And what that was, was assuming that his testimony in that case, because again, that's all there was in that case, was the deposition testimony. Assuming that he had attempted, as he said, to amend his charge and the EEOC turned him away at the door and failed to follow its own statutory and regulatory obligations, whether that constitutes grounds for equitable waiver totally aside from whether it would have fallen within that scope. And this court in Hicks said, yes, those are grounds for equitable waiver. And all of these concerns like notice to the defendant and this sort of thing, because Title VII is a private attorney's general statute, because individual enforcement of their rights is so important in this context, this is what's going on. Can we say categorically that in Hicks there wasn't, they did not, we did not require a verified complaint in order to, a verified amendment in order to recognize an equitable exception? Absolutely right. In fact, really, if you're going to make this about verification, Your Honor, there was no verification in Hicks either. I mean, in fact, there wasn't even anything in writing. Hicks was oral. Hicks, he said, he went to the EEOC, I said I wanted to amend it, and they said no. So really, if we were going to frame this as a verification issue. But we don't know what he presented. Or you're saying we do know what he presented, that he presented a verified amendment? Do we know for a fact that he didn't? In Hicks, his testimony in that record is, they told me I wasn't allowed. So we pretty much can infer from the decision in Hicks that he didn't present anything, much less anything verified. If there are any further questions from the Court? Thank you very much, Ms. Theron. Thank you. Mr. Henry. Good morning. Good morning, sir. How are you? Fine, thank you. May it please the Court. My name is Sean Henry, and I represent Sutliff Saturn. My colleague, Mr. Etter, is unable to attend because his father is taken ill. We would like to begin by pointing out that the District Court was absolutely correct in its determination that at the end of the day, Mr. James was unable to provide sufficient information to show that there was pretext in the employer's answer. Let me point out a couple things that I saw in the record that gave me a little pause. Yes, Judge. He testified that when he was called in and was terminated, he was told that his position had been eliminated. Now, as the case has developed, it seems clear that his position was not eliminated, but a one-month employee was placed in that position. That is incorrect, Judge. If you will look at the record, you will find that, in fact, at all times Sutliff previously had two individuals who were full-time technicians. What happened was that Mr. James was the individual who was in charge of the shop. Because of reduced business, as Mr. Sutliff testified, they then only had space for one individual. They did, in fact, prefer that other individual over Mr. James, but ultimately the reasoning for that was that Mr. James had discipline, which that other individual did not have, and that ultimately the employer believes that that fellow was doing, in fact, the proper job. Except Mr. James was the lead, and if there were two, then he was the lead. Clearly, when the smoke cleared, a second position was eliminated, but the lead was given to Sulzer. Is that correct? No, Judge, I would say it is not. Ultimately, when we talk about how those positions would be classified, both would be employees. Mr. James is not a member of management. He is simply a lead technician, which means he is responsible for the other technicians, but he is not the lead. He is not, rather, a member of management. So you weren't just removing a management position. I believe that if you looked at the employer's documentation, which, by the way, is not in the record, but if you look at the... Were the performance reviews subpoenaed? Negative, Your Honor. They were not. They were never requested in discovery? That is correct, Your Honor. They were not. Well, let me ask you another question. There is an indication that Sulzer was competent and reliable, and some indication that one of the reasons James was not retained was discipline, yet Mr. Sound said he did not look at the personnel file of Mr. James. Isn't that correct? That's correct, I believe, Your Honor. And by the way, may I back up on my earlier statement? I wasn't in the case at the time of the initial subpoena, so I do not believe they were subpoenaed, but I will not say categorically they were not. I'm talking about the performance reviews. So let me just back up on that statement to make sure I don't... Because he said he had excellent performance reviews. Right. And he cites these few discipline problems. Right. And yet he's a six-year employee. I mean, he was reliable until he went out on leave, and then all of a sudden there's testimony, well, he was here, Sulzer was here working. You weren't. He comes in five days before. Well, they're here doing the best they can without you. It seems a little bit strange that when he shows up, he is just not doing his job. Interesting you should raise that issue, Judge, about the testimony. In fact, it is well understood that a plaintiff may not survive a summary judgment motion by his own unsupported beliefs and allegations. And what's happened here is that Mr. James has made the comment, I am the one who went in there and said, you know what, that other guy's not doing the good job. By the way, it's Mr. James who talks about the idea that, well, I was much better than he was. That testimony all comes from Mr. James. The idea, I've repeatedly heard counsel now say at least three times that for all intents and purposes, this guy was here six years. Why would you get rid of him? Why would we get rid of him? Why would we get rid of him? We would get rid of him because of the performance issues. This is not a union situation where somehow or other the individual has some sort of right to his position because he's been there longer. In this particular instance, you have an individual who would claim, and let's put Hicks aside for a second, race discrimination and ultimately disability discrimination. Well, what did the employer do in this instance? The employer had an individual who was on FMLA leave and then gave him additional leave to which he was not entitled necessarily. All right? And we would argue, as we did in our brief, that the individual's not disabled. But still, even so, the employer gave him additional time. If the employer wanted to get rid of him, the easier time to do that Let me ask, what are the performance issues with respect to Mr. James? As far as a detailing shop, Your Honor, I think you may be aware that certain car buffs out there like to have their cars pretty clean. You put individuals in there in a detail shop and you have a facility that essentially is filthy when they come in for an inspection. Now, Mr. James indicates, well, I wasn't the individual who was there, I wasn't the person who was in the spot at the time, and the two white employees who were there weren't in fact given any discipline. But James testified If you could tell me, when was that? Yes, ma'am. It was in 2004. So you're talking about more than two years before he was terminated and James was held on. Rather, he was still maintained in employment. But if I may say, James testifies in his deposition, this is James Deposition 49, pages 18 through 20, sorry, lines 18 through 22, when asked about what the position of his lead person carried. He said, everything fell back on me. Okay, and you understand that. He said, yes. Then going on to ask about the discipline, we talk about the idea you were the highest person in the shop, right? And he says, yes. And the reason for that, and is that the reason he wrote you up, the answer, yes. And then it goes on to say, so you're not contending that the discipline was unfair because of your race or disability? And he says, no. Again, Mr. James identifies the fact, and I believe that one of the judges mentioned earlier, it may have been Judge Chirica, that ultimately when Mr. Sutliff walked into the facility and saw the condition of that detail shop, Mr. Sutliff testified that it's not possible for all of that debris to have arrived there in a single week. There were too many soda bottles, too many cigarette butts, and by the way, pornographic material in the area. Well, that may be correct, but he then continues to work without incident. That is correct. And we don't have his performance reviews. So all we can take is his deposition testimony, then he got excellent performance reviews. So there may have been a problem in the past, but we have nothing saying that he didn't do his job as well as or better than Salzer did the job, do we? Oh, but Judge, please, in the issue of the McDonnell-Douglas burden shifting analysis, the idea is that after we have proffered the legitimate nondiscriminatory reason, which we have, I'm going to push this down just a bit, which we have, the requirement now is this burden of proof shifting to plaintiff. Now, we're not talking about a burden of proof. We're talking about a burden to produce evidence. Excuse me. Yes, Judge. What is the legitimate nondiscriminatory reason? The elimination by Saturn of a particular model that was going to mean a reduction in the business? What are you relying upon? Right. In that particular instance, the employer talks about the fact that it's demunition in business no longer required it to have two technicians. That's what I'm getting at. It has been unclear to me. Whether it was because Saturn had reduced. No, Judge, that didn't happen until 2008. It has not been clear to me whether or not what we're actually talking about in this case is effectively a reduction in force. That is correct. Are we talking about a reduction from three positions to two positions? And is it the position of Sutliff-Saturn that this reduction was because of, and I recall testimony from the one deposition, about Saturn's elimination of a model and there would therefore be less car sales. Is that it? Saturn did ultimately reduce models. I know, but is that the position? Because it hasn't been clear to me that that is the legitimate nondiscriminatory reason that has been advanced here. It's not even been clear to me that what has been suggested by Sutliff is that what took place here was a reduction in force. Roger that, Judge. In our brief, we talk about the fact that the legitimate nondiscriminatory reason is the fact that we only had a need for a single position. So it is a reduction in force from two full-time positions to one. The owner identified the fact that he had no requirement to go further with it. But again, Judge Rendell, if I may answer your question earlier. Let me back up. The other legitimate reason that you're proffering goes to the issue of, well, Sulzer versus James, because you have to answer that. You have to say, even though you reduced, you picked the one-month guy, not the six-year guy. That is correct. You have to show that that was legitimate as well. And we identified the fact that in a reduction in force, once again, this is not a union situation. The employer has the right to look at the employees that it has and make a determination as to who they feel could best fill the position. In that instance, this Court does not sit as a super personnel agency, and ultimately the employer determined that Mr. Sulzer would have been a better individual to accomplish the task because he had no discipline whatsoever. Let me go back again because you have no discipline, although Sam didn't look at his personnel file, and the discipline was two years ago, the most recent discipline. Let me ask you, we have testimony from James that he got excellent performance reviews, and so he has raised an issue of it wasn't legitimate to pick Sulzer who was competent and reliable because I had gotten excellent performance reviews. And the discipline issues weren't that big a deal anyway because the nearest one was two years ago, and another one was when I first started. So I'm wondering whether in response to that, the company had the burden to say, well, wait a minute. Your performance really wasn't that good. No, Judge. We believe that this very circuit in Moresby Lower Marion School District points out the fact that the plaintiff's bald assertions are simply insufficient to avoid a determination in summary judgment. And what has happened here is that once there has been – But that was a bald assertion about a mental state in that case. Here his bald assertion is a factual one. I had excellent performance reviews. And it is his own assertion alone, which is not supported by any other evidence. Plaintiff could have, in fact, have asked for that evidence. He could have subpoenaed that evidence, but he did not do so. Ultimately, when we look at the idea of whose burden it is at this point, the plaintiff's burden is to show pretext. And that plaintiff must bring forth affirmative evidence to show pretext. He can't simply say, well, I think so. And going to the issue of him saying that, I point to the idea that when asked about whether or not he felt his disability created – or his race or his disability created the reason for his discipline, plaintiff indicated, what specific reason do you have for contending that Mr. Som made the comment to you because of your race or disability or alleged disability? And plaintiff says, specific reason? I don't really have one. But it had to be something, right? Now, again, that goes to two issues here. First, it goes to the issue of the idea that the plaintiff believed, well, it had to be something other than what they're saying, but I don't really know what it is. And I'll say this much, that the Hicks argument has been raised more than once here. And we will not go to the idea of saying that we're looking to deprive plaintiffs of their day in court. We will say, however, that equity cuts both ways. And the employer has a right to some level of interest in this as well. And Judge Rendell has indicated in her, in at least one of her determinations, that there is the understanding that the employer has some right here to ensure that they're not going to have to respond to frivolous claims. Ultimately, in this instance, the plaintiff's own testimony, well, it had to be something, right? Goes to the idea that, look, later on down the road, here we are in Hicks talking about the idea of equitable tolling, but the plaintiff in this instance really did not go so far as to do all the things that they needed to do. Because why? We talk about whether or not there was a verification. I think there's absolutely no question that there was no verification here under the rules. Now, again, I heard the argument about whether a verification was required at all as far as an amendment. But, again, there's no signed document that says pled under oath. We get that. But let's go to the idea of equitable tolling for a second. When we start to talk about the equity involved here, equity has always been considered to be something that also involves some interest on behalf of the plaintiff to make all efforts to ensure that, in fact, this charge has been raised. In this particular instance, as we raised in our brief, I should point out that the Pennsylvania Human Relations Commission's office is down the block, I mean literally blocks away from downtown Harrisburg, where Ms. Finale Greer maintains her office, and we know Lisa very well. Ultimately, there was never a phone call to us. We've dealt with Lisa in a number of cases. You said, look, you know what, I've amended this case, and here's what we're going to have. Never a phone call. Two years went by. You know, plaintiff talks about the idea in her brief that she had no reason to believe this charge didn't go forward. Is that really true? Is that really true? Because after you amended that charge, what happens next? What happens next is you get an answer, and that answer is an amended answer, and you never got one. When you never got that amended answer, a phone call to Mr. Adder, a phone call to the PHRC couldn't have occurred two and a half years. That's an awfully long period of time. I understand that plaintiff talks about the idea that her own particular circumstances may have caused difficulties here, but we don't believe that that was sufficient. As far as equity is concerned, we certainly do not feel that plaintiff has taken all steps that were necessary to ensure under either the agency's rules or just plain due diligence that they had actually taken the steps that were required. So, again, we don't believe that equity applies here, but even if it did, ultimately our argument here is that plaintiff has failed to produce evidence, which is what the requirement is under the McDonnell-Beggis burden-shifting test, produce evidence to show that the employer's commentary is pretext. You can't simply say, well, I don't think that's the case, and that's what he's done here. He's asking this court to reverse the lower court's determination on the view that he's saying, well, I don't think that's got to be it. It's got to be something, right, as he says in his deposition on page 40 between lines 21 and 25. We ask that this honorable court, I see that I've gone over my time, we ask that this honorable court affirm the decision of the district court on the view that ultimately the plaintiff has presented no evidence to refute the legitimate non-discriminatory reason proffered by defendant. Any other questions? I would like a supplemental letter to be filed telling me about the performance reviews, something that counsel said was she asked, but they weren't there. Were they there? Were they requested? Could you provide factual statement that will be part of the record as to exactly what happened? Were they asked for in discovery? Did the company not have them? I'd just like that cleared up. We certainly will, Judge. Any other questions from the panel? Good. Mr. Henry, thank you very much. Thank you, ladies and gentlemen. Ms. Fennelly Greer. Okay, Your Honor. I'd like to address several things. The first is that we did request performance reviews. In fact, Mr. Etter, who was the counsel at that time, gave me the personnel file of Mr. James, and he did that shortly after we began this case, and there was hardly nothing in it. There weren't any performance reviews. And I know that when we do ---- You can put that forth in a letter. Yes, I will actually pull our files on this. But also I want to say that normally we have a catchall in our discovery request where we ask for everything. But I remember him saying to me, and I know Mr. Etter isn't here today, but I remember him saying that he gave me the personnel file but there wasn't much in it because Sutliff didn't really do a lot of things. And according to Mr. James, he testified, so his testimony is uncontroverted, that clearly he said he had good performance reviews. I mean, this is a man who was promoted to lead technician. This is a man who's been doing this job for six and a half years. He's supervising the other employees. I mean, so this isn't someone who's just, hey, off the street and only been working there, you know, a month like Mr. Salzer. The other thing I want to talk about is the whole amendment issue. Okay. And if you go to the appendix at 158A, you'll see that this is September 2nd of 2006. This is my original letter to Mr. Smedley where I say on behalf of Mr. James, I would like to have an amendment filed to Mr. James' current complaint to include an additional count to perceived disability and disability discrimination. See attached sheet. We wish to retain the entirety of Mr. James' current complaint, including paragraphs 1 through 19. When I did this before for one of the other cases, the human relations representative prepared the amended complaint. Please let me know if you wish to prepare by telephoning me above. Okay. That was on September 2nd of 2006. I then sent him an attorney drafted an amendment. And, of course, he, Mr. Smedley at the time, he then responded to me in, I believe, November, two months later and said, no, no, you need to have your client sign this questionnaire or what I thought was a questionnaire. I didn't even know what it was, but we complied with what he asked for. And then I personally handed that in to the Pennsylvania Human Relations Commission. It was time stamped. I went there in person and gave it to him. My client signed and dated that form. Now, according to the EEOC's brief, what Mr. Smedley had sent me was a CMS internal document. It wasn't even a, he didn't even send me the right form. But he wouldn't let me, he wouldn't accept this first thing that I tried to do, which clearly paragraphs 1 through 19, and then there was a verification that followed. And the other thing I want to point out, Mr. Henry is incorrect. Here we filed a good underlying charge. So we have, similarly to Hicks, we have a good underlying charge, which is a race discrimination charge. And then in Hicks, they brought in the sex discrimination charge because they said that, you know, it would all come out of the same circumstances. Well, here's the same circumstances in this case. We have race discrimination and we have disability discrimination. All of them involve the same actors, three people, John Somm, David Smith, and John Sutliff. They all involve the same period, the fact that on March 2006 when he came back to work, he was instantly discharged that day. So everything falls around the same. It grows out of the same complaint. And, Judge Rendell, you were correct when you asked Mr. Henry, well, wouldn't, you know, wouldn't this grow out of an investigation? And the other thing about the PHRC's investigation here, I want the court to know, is that we weren't even aware. We did not even get the findings of fact. If you look on the letter sent by Duane Lee, I was never copied on that letter as appellant's counsel, nor was the police counsel at the time. So clearly the PHRC totally screwed up this. And we pled a failure to process this case. We're saying that this case is like Hicks. This case is like Hicks because we had a good underlying charge, and we even went further than Hicks. When was it that you realized that it had not been processed? Your Honor, I did not realize it until we got the EEOC right to sue in, I believe, it was when I called Mr. Smithy, when I called Mr. Smithy back in 2009, and that was early, that was June, early June of 2009. That's when he told me that the amendment had never been processed. And you filed the amendment when? I filed the amendment in 2006, December 22nd of 2006. Now, Mr. Henry brought up the fact that, oh, by the way, my office is not in Harrisburg. My office is approximately a half hour away in Grantham, so I do not have an office in Harrisburg. The other thing he brings up is the fact that, oh, well, how come you didn't call? Well, I can tell you something. It's not uncommon for, you know, I did call Mr. Smedley. He told me he had the documents that we had given him. I also told him in my letter that if he needed anything else to let me know. Mr. Smedley was someone who had 30-plus years of experience at the commission. I relied on him that he process the amendment. He told me he did. It wasn't until I learned from William Smithy in early June of 2009 that it had never been processed. Now, we did in our federal court complaint address all this, and we did attach everything. Good. Let me ask my colleagues if they have any other questions. Good. Okay. Thank you very much. Thank you, sir. We would request that this case be remanded back to the federal court. Good. Thank you. The case was well argued. We will take the matter under advisement.